UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-Civ-20907-COOKE

LEVI JESSIE MEDINA a/k/a
JUAN PEREZ,

    Petitioner,

vs.

SECRETARY, DEPARTMENT
OF CORRECTIONS,

    Respondent.
_____/

### ORDER DENYING PETITIONER'S APPLICATION FOR HABEAS CORPUS RELIEF PURSUANT TO 28 U.S.C. § 2254

Petitioner Levi Jessie Medina, a state prisoner confined at Jefferson Correctional Institute in Monticello, Florida, filed, through counsel, a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (ECF No. 1), along with a Memorandum of Law in Support of Motion for Habeas Corpus Pursuant to Title 28 U.S.C. § 2254 (ECF No. 7), attacking the lawfulness of his conviction in state criminal case number F01-15121. In response to an Order to Show Cause (ECF No. 8), Respondent filed its Response to Order to Show Cause, along with supporting Appendix containing exhibits of the state court record and trial transcripts (ECF Nos. 10, 11), arguing that Petitioner's Petition should be denied (ECF No. 9). After reviewing the Petition, the Response, the parties' argument at an evidentiary hearing held on May 14, 2014, the record, and relevant legal authorities, Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody is denied.

I.   BACKGROUND[1]

This case involves a night out with friends gone wrong after a man disappears; his car burned and his body missing.  In sum, the evidence admitted at trial reveals as follows.

Victor Espejo, the victim, lived with his grandmother, Graciela Garcia, in a trailer park in southwest Miami.  On April 10, 2001, Victor received a call on his cell phone from Petitioner about a party that night in Miami Lakes.  He told his grandmother that he was going out and got in his car and drove away.  That was the last time Graciela ever saw Victor.  When Victor did not return home the next morning, Graciela filed a missing person's report at the local police station.  She testified that Victor would never stay out all night because he had work the next morning.  A few days after his disappearance, she gathered people to help her look for him, and asked Petitioner to help.  Petitioner agreed and told her that he had called Victor on the night of April 10th to go out.  Petitioner also told Graciela that he had loaned Victor a flowered black shirt and that Victor had left him after the party and gone to Homestead with a black guy.

On the night of April 10th, Victor arrived at Petitioner's house in a white Pontiac Sunfire and picked up Petitioner, along with Petitioner's friend Floyd Ruel.  They stopped at Floyd's house to drop off his car and then Floyd joined Victor and Petitioner in Victor's car.  They then picked up Tito, whose real name is Modesto Guzman, at his house in Sweetwater.  Tito brought with him a little black purse, which contained a black automatic .22 caliber gun.  Tito sat in the backseat with Floyd, while Victor drove and Petitioner sat in the front passenger seat.

Victor first drove to Hialeah to pick up girls who were supposed to join the group and go to the party with them in Miami Lakes, but he could not find the girls.  The group then drove to a liquor store and bought White Horse Rum before heading to the party in Miami Lakes, which was thrown by a girl named "Barbie."  They were in and out of the party, leaving at some point to look for more alcohol, and eventually left the party for good at around midnight or 12:30 a.m.  They decided to drive to Miami Beach, where they were joined by more friends and stayed until around 3:00 a.m.  They then left Miami Beach together, and as Victor was driving, Petitioner pulled out a gun from under his seat and fired

---

[1] A more extensive review of the evidence admitted during trial, with references to the trial transcript, can be found at Petitioner's Initial Brief, submitted in support of his direct appeal (ECF No. 10-1) and the State's Answer Brief (ECF No. 10-1).

four or five shots out his window. Victor dropped Floyd off at his house at around 3:30 a.m.

The next morning, Floyd testified that he drove to Petitioner's house and that Petitioner was unusually quiet. When Floyd asked Petitioner if anything was wrong, Petitioner asked Floyd if he was wearing a wire. Floyd asked Petitioner why he would ask that, and Petitioner responded that he had done something bad. Floyd met with Petitioner again a few days later. Petitioner asked Floyd for a ride and Floyd suggested that Petitioner ask Victor for a ride instead. Petitioner then told Floyd that Victor was missing and that police had found his car burned. When Floyd asked Petitioner how he knew that, Petitioner responded that he had seen it on the news.

A few days later, Floyd asked Petitioner what had happened to Victor and Petitioner stated that the night they all went out, Victor, Petitioner, and Tito stopped at a gas station. Petitioner and Tito went inside to buy cigarettes and pay for the gas while Victor stayed outside pumping gas. When Petitioner and Tito returned to the car, they saw Victor with an unknown black male who asked Victor for a ride. He offered Victor $40 in return for a ride and Victor accepted. Petitioner then stated that he and Tito walked home. When questioned by Detective Mallot, Petitioner told the same story, except he also mentioned that he had $100 in his pocket that night. When Detective Mallot asked why he didn't take a cab home since he had the money to pay for it, Petitioner responded that he decided to walk. He also told Detective Mallot that he thought Victor burned his own car for insurance purposes and that the gun in the black pouch was in the car when it was set on fire.

However, when questioned by Detective Mallot again, Petitioner stated that after the stop at the gas station, Victor dropped Petitioner home and left with Tito in his car. He claimed that he and Tito showed the black male the gun and that the black male took the gun and ran off with it. He also stated that Tito came over the next day in Victor's car and then drove Petitioner to the Everglades to the spot where they dumped Victor's body over a guardrail. Petitioner then later admitted that he told his mother that Victor was dead and stated that he was going to tell Detective Mallot the whole truth. He stated that he, Victor, and Tito were planning on going to Miccosukee. They stopped at the side of the road because Petitioner had to urinate. Petitioner then pointed the gun at the back of Victor's

3

head and squeezed the trigger twice, but the gun jammed. Tito then took the gun from Petitioner and shot it. Petitioner stated that he wanted to see what it would be like to kill someone. Victor fell to the ground and Tito shot him two more times in the head to make sure he was dead. Petitioner and Tito then put Victor's body over a guardrail next to some trees to hide the body, and drove off in Victor's car. They returned shortly thereafter though because Petitioner was concerned that his fingerprints were on the shell casings. So they picked up Victor's dead body, placed it in the trunk of the car, and went to purchase gasoline. They then poured gasoline on the car and lit it on fire. They placed Victor's body in a dumpster next to the burning car.

The fire department responded to a call of a vehicle on fire on April 11, 2001 at around 11:18 p.m., and found a 1998 Pontiac Sunbird. At trial, the fire investigator, Lt. John Tolbert, testified that the fire started in the interior of the vehicle as a result of an open flame, most likely from a match, lighter, or cigarette.

## II.   PROCEDURAL HISTORY

Petitioner, along with co-defendant Tito, was charged with First Degree Murder (Count 1), Criminal Mischief over $1,000 (Count 2), Tampering with Physical Evidence (Count 3), and Display/Use of a Firearm while Committing a Felony (Count 4). Petitioner proceeded to trial on all four counts and was found guilty by a jury of the lesser-included offense of Attempted First Degree Murder without Discharging a Firearm as to Count 1, along with Counts 2, 3, and 4. Petitioner was sentenced to thirty years in prison as to Count 1, with a ten-year mandatory term of incarceration. Petitioner was also sentenced to five years of incarceration as to Counts 2 and 3 and fifteen years as to Count 4, to run concurrently with his sentence as to Count 1.

Petitioner appealed his conviction to the Third District Court of Appeal, Case No. 3D08-187, on May 13, 2009. In his Initial Brief, he made the following arguments:

> I.   Where there was insufficient evidence showing that the victim's disappearance was the result of the criminal agency of another, the trial court erred reversibly in allowing the introduction of the Defendant's confession.
> II.   The erroneous admission into evidence of a collateral crime was prejudicial and requires reversal.

4

The Third DCA affirmed Petitioner's conviction in an unpublished *per curiam* opinion on May 13, 2009. *See Medina v. State*, 8 So. 3d 1275 (Fla. Dist. Ct. App. 2009).

Petitioner then filed a state petition for habeas corpus on May 25, 2010 in the Third District Court of Appeal, Case No. 3D10-1348, challenging his appellate attorney's performance as follows:

> I. Appellate counsel was ineffective for failing to present for appellate review a clear *Crawford v. Washington* violation which occurred at trial.
> II. Appellate Counsel was ineffective for failing to present on appeal the preserved issue of the state's improper closing argument comments.
> III. Appellate counsel was ineffective when he failed to present and appeal the shift in burden caused by the state during closing argument.
> IV. Appellate counsel was ineffective when he failed to present as a claim on appeal that the state called the Petitioner a racist during the closing arguments.

The state appellate court denied Petitioner's petition on October 20, 2010. *See Medina v. State*, 51 So. 3d 469 (Fla. Dist. Ct. App. 2010). Petitioner filed a petition for rehearing on January 4, 2011, which was denied on January 11, 2011 without a mandate.

Petitioner then filed the present federal petition for habeas corpus on March 6, 2011, with the following five claims:

> I. Petitioner's due process rights were violated when the government failed to prove the Petitioner's involvement beyond a reasonable doubt on the missing corpus delicti of the offense.
> II. The State Court erred when it failed to apply a clear Fifth Amendment violation when the prosecutor was allowed to appeal to the sympathy of the jury.
> III. The State Court's failure to vacate the counts of conviction in light of the Supreme Court's Decision on *Crawford v. Washington*, 124 S. Ct. 1353 (2004), mandates this Court's intervention.
> IV. The State Court erred when it failed to remand the case in light of the burden shifting caused by the State during closing arguments.
> V. Petitioner's constitutional right to a fair trial was violated when the prosecutor called Petitioner a racist during the closing arguments.

5

The State filed its Response brief on May 5, 2011 and I held an evidentiary hearing on May 14, 2014.

### III. ANALYSIS

#### a. Exhaustion[2]

A state prisoner must exhaust all state remedies that are available for challenging his conviction prior to bringing a habeas action in federal court. 28 U.S.C. § 2254(b)(1)(A). A petitioner exhausts a claim when he affords the state habeas court "a full and fair opportunity to address and resolve the claim on the merits." *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1343 (11th Cir. 2004). However, a district court also has the discretion to rule on a § 2254 petition on the merits even if a petitioner fails to exhaust his state remedies. 28 U.S.C. § 2254(b)(2).

Here, Ground One was exhausted in Petitioner's direct appeal, while Grounds Two, Three, Four, and Five were raised in Petitioner's state habeas corpus petition as claims of ineffective assistance of appellate counsel. While Grounds Two, Three, Four, and Five are before me now under the guise of trial court error, I find that they are substantively similar to the claims raised in Petitioner's state habeas corpus proceedings. Therefore, I find that Petitioner has properly procedurally exhausted all claims before me now. Additionally, even if the claims have not been properly exhausted, I am exercising my discretion to rule on them pursuant to 28 U.S.C. § 2254(b)(2).

#### b. Merits

Pursuant to the AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits, which warrants deference. *Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir. 2008).

---

[2] The State admits, and I agree, that this Petition is timely under the one-year limitations period imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244.

"Clearly established federal law" consists of the governing legal principles, rather than the dicta, set forth in the decisions of the United States Supreme Court at the time the state court issues its decision. *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court correctly identified the governing legal principle, but applied it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005); *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000) or, "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at 531. The unreasonable application inquiry "requires the state court decision to be more than incorrect or erroneous," rather, it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75–77 (2003).

Finally, the Supreme Court has clarified that "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003). When reviewing a claim under § 2254(d), a federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). *See, e.g.*, *Miller–El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

### i. Ground One: Corpus Delicti

Petitioner argues that the state court erred in failing to grant Petitioner's motion for judgment of acquittal based on the lack of corpus delicti linking Petitioner to the offenses charged. More specifically, Petitioner argues that the state court made a decision based on an unreasonable determination of the facts in light of the evidence presented because the prosecution failed to present any evidence showing that Victor Espejo was actually killed and that he died as a result of the criminal agency of another person. Therefore, Petitioner argues that it was error for the state court to permit the admission of Petitioner's confession, as recounted to Detective Mallot, without proper proof that a crime was in fact committed. In response, Respondent argues that Petitioner has failed to state a constitutional violation and that generally, a state's evidentiary rulings do not present constitutional issues cognizable in a federal habeas corpus petition.

After considering the arguments presented by both Petitioner and Respondent, I find that Petitioner's claim fails to raise a constitutional violation. Although he advances his argument in the guise of a due process violation, the claim is grounded on an assertion that the state court improperly interpreted its own evidentiary rules regarding corpus delicti and the admissibility of Petitioner's confession. A state court's allegedly erroneous interpretation of its own rules may not be raised in a federal habeas petition. *See Brannan v. Booth*, 861 F.2d 1507 (11th Cir. 1988) (denying petition as having only raised issues of state law, finding that "[a]lthough petitioner alleges violations of federal law, it is clear that his petition is based exclusively on state law issues which are merely 'couched in terms of equal protection and due process.'"). Only where a state court's evidentiary ruling can be said to have deprived a defendant of his constitutional right to present a defense is there a basis for granting relief. *See United States v. Perry*, 379 Fed. Appx. 888 (11th Cir. 2010). In the present context, the state court's decision to allow Petitioner's confession does not mean that he was deprived of his right to present a defense. Accordingly, Ground One does not merit habeas corpus relief. *See Estelle v. McGuire*, 502 U.S. 62 (1991).

Additionally, even after considering the merits of Petitioner's claim, I find that he has failed to demonstrate that the findings of the state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light

8

of the evidence presented in the state court proceeding. Under Florida law, an uncorroborated confession alone may not be relied upon to establish the corpus delicti. *Atkins v. Florida*, 452 So. 2d 529, 532 (Fla. 1984). In order to prove corpus delicti, the State must establish that a crime of the type charged was committed and that the crime was committed through the criminal agency of another. *State v. Allen*, 335 So. 2d 823 (Fla. 1976). However, it is not necessary that the State prove that the crime was committed by the defendant for purposes of corpus delicti. *Lester v. McDonough*, 2007 WL 2412937, at *7 (M.D. Fla Aug. 21, 2007). Here, the state presented the following evidence: (i) Victor disappeared after a night out with Petitioner and was never heard from again; (ii) Victor's car was found burned; (iii) the car fire was a result of arson; (iv) Victor was last seen with Petitioner and Tito, and Petitioner was in possession of a handgun, which he had fired the night of Victor's disappearance; (v) when Floyd visited Petitioner a few days after the disappearance, Petitioner asked Floyd if he was wearing a wire and told Floyd he had done something bad and that Victor's car had been set on fire. In light of this evidence, it was not unreasonable for the trial court to determine that Victor was dead and that his death was the result of criminal activity.

### ii. Ground Three: Alleged *Crawford* Violation

Petitioner argues that the state court's allowance of the introduction into evidence, during the testimony of retired detective Michael Hernandez, of an Arrest Form ("A-Form") containing confrontational statements regarding Petitioner's co-defendant's involvement in the crimes charged constitutes error by the state court and a violation of Petitioner's Sixth Amendment right to confront his co-defendant. According to Petitioner, the A-Form contained a sworn statement from Petitioner's co-defendant, Tito, confessing and incriminating Petitioner. Counsel for Petitioner objected at trial to the State's introduction of the A-Form because it contained confrontational statements by Tito, which could not be confronted at trial because Tito did not testify and thus, could not be cross-examined. However, the trial court judge overruled Petitioner's counsel's objection.

In response, Respondent argues that the A-Form was never actually introduced into evidence; the jury only heard that, based on Detective Hernandez's conversations with other detectives, he included a statement in his affidavit that Petitioner shot the victim. As such, Respondent argues the jury never heard about any statement Tito provided to the police.

9

Additionally, Respondent argues that any error committed by the trial court judge in allowing Detective Hernandez to testify that he learned that Petitioner shot the victim is harmless because in the end, the jury found that Tito shot the victim, not Petitioner.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). The Supreme Court held in *Crawford v. Washington* that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is … confrontation." 541 U.S. 36, 68-69 (2004). In *Crawford*, the Court established a rule that, "[w]here testimonial evidence is at issue … the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68. The Court drew a distinction between testimonial and non-testimonial hearsay, finding that only "testimonial" statements cause the declarant to be a "witness" within the meaning of the Confrontation Clause. *Id.* at 51. The Court also provided guidance on what types of statements constitute "testimonial statements": (1) "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52 (citations and quotations omitted).

A review of the record here reveals that the prosecutor initially sought to use the A-Form for impeachment purposes during his cross-examination of Detective Michael Hernandez. Trial Tr. 944:3-5, ECF No. 11-12. The prosecution marked the A-Form for identification as exhibit 1-U. Trial Tr. 948:11-12. Counsel for Petitioner repeatedly objected to the prosecutor's attempts to introduce the A-Form into evidence, and the trial court judge sustained his objections. Trial Tr. 947:5; 949:13; 952:3. However, the trial court judge did allow the prosecutor to inquire as to whether Detective Hernandez had

10

knowledge, either personal or gathered from other detectives, of the information contained in the A-Form. Trial Tr. 950:16-951:22. As part of that inquiry, the prosecutor asked Detective Hernandez, "in fact, you're [sic] included within the report that the defendant admitted to committing a murder?" and Detective Hernandez replied, "yes, sir." *Id.* The prosecutor went on to read aloud the following from the A-Form, "when for no apparent reason the defendant shot the victim with a small caliber weapon which caused the death of the victim," which Detective Hernandez admitted was based upon his conversations with other detectives who had interviewed Petitioner. Trial Tr. 952: 17-25.

      A review of the trial record indicates that, contrary to Petitioner's assertions, no part of the A-Form was ever introduced into evidence. In fact, the trial court judge sustained every objection Petitioner's counsel made to the admission of the A-Form into evidence. The A-Form was marked for identification as exhibit 1-U, but never formally moved into evidence.[3] Additionally, the portions of the A-Form that were read out loud in front of the jury related to statements allegedly made by Petitioner to other detectives investigating the homicide, which were then gathered by Detective Hernandez and listed in the A-Form. At no point were statements by Petitioner's co-defendant, Tito, introduced into evidence or used in any way to implicate Petitioner. The record also reveals that Petitioner had an opportunity, on redirect, to clear up any misunderstanding the jurors may have had with regard to the statements contained in the A-Form. Additionally, Detective Hernandez was a witness for Petitioner and the A-Form was referenced during his cross-examination by the prosecution. Any concerns Petitioner had regarding confrontation could have been remedied by calling those detectives whose statements formed the basis for the A-Form to testify, thus avoiding any potential confrontation issues. Therefore, after reviewing the trial court record, I do not find that any violation of Petitioner's Sixth Amendment right to confrontation occurred during the prosecutor's discussion of the A-Form in his cross-examination of Detective Hernandez.

---

[3] Counsel for Petitioner admitted at the evidentiary hearing held on May 14, 2014 that he misstated facts in his briefing and acknowledged that while the A-Form was marked for identification, it was not admitted into evidence. He also tacitly acknowledged that the jury did not ever see the A-Form. The issue as he presented it at the evidentiary hearing had more to do with Petitioner's inability to cross-examine those officers whose statements were incorporated into the A-Form.

11

### iii. Grounds Two, Four, and Five: Statements During Closing Arguments

Although expressed as violations of different constitutional provisions, Grounds Two, Four, and Five essentially argue that the state court erred in failing to reverse Petitioner's conviction after the prosecution made allegedly improper comments during closing arguments.

Generally, "[t]o warrant reversal of a verdict[,] prosecutorial misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Thomas*, 8 F.3d 1552, 1561 (11th Cir. 1993) (citing *United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir. 1987)). "Specifically, a prosecutor's remark during closing argument must be both improper and prejudicial to a substantial right of the defendant." *Id.* (citing *United States v. Bascaro*, 742 F.2d 1335, 1353 (11th Cir. 1984)). In determining whether the prosecutor's remarks warrant habeas relief, the proper inquiry is "whether the improper remarks were of sufficient magnitude to undermine confidence in the jury's decision. If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair." *Tucker v. Kemp*, 802 F.2d 1293, 1296 (11th Cir. 1986).

Prosecutorial comments should not be considered in isolation. *Cargill v. Turpin*, 120 F.3d 1366, 1379 (11th Cir. 1997). Instead, reviewing courts must examine the entire context of the trial proceeding. *Id.* (citing *Brooks v. Kemp*, 762 F.2d 1383, 1413 (11th Cir. 1985)). Additionally, the court must consider whether "'defense counsel's closing argument ... ameliorate[d] the damage done to the defense by the prosecutor's [statements].'" *Id.* (quoting *Davis v. Zant*, 36 F.3d 1538, 1551 (11th Cir. 1994)). Likewise, the trial court's instructions to the jury "'may remedy [the] effects of improper comments.'" *Id.* (quoting *Brooks*, 762 F.2d at 1400).

Given the above, I will now analyze each individual issue advanced by Petitioner.

#### 1. Ground Two

Petitioner argues that the state court erred in allowing the prosecutor to make several statements during closing arguments that inappropriately appealed to the sympathy of the jury. More specifically, Petitioner cites to the following statements made by the prosecutor during his closing statement:

> Prosecutor: The judge will tell you to follow the law. I want you to follow the law. You know what justice is? For an innocent person, justice is freedom. If this defendant were truly innocent, your obligation is to say ---
>
> Defense Attorney: Judge, objection, excuse me.
>
> Judge: Overruled.
>
> Prosecutor: --- your obligation will be to say individually and collectively the defendant is not guilty of these crimes. He should be allowed to leave this courtroom a free man. But there is more to justice than that. There's justice for the victim, there's justice for the family, there's justice for society.
>
> Defense Attorney: Judge, I object.
>
> Judge: Overruled.
>
> Defense Attorney: I think we need a sidebar.
>
> Judge: Overruled, sit down. We'll take it in a minute.
>
> Prosecutor: There's justice for the people who commit crimes. You know what justice is? It's an unpleasant thought. But justice for a person who commits a crime, who is guilty of a crime, is to be convicted. That's what justice results. That's what our society requires of us.

Trial Tr. 1074:6-1075:10. In response, the State argues that the prosecutor's statements did not exceed permissible bounds because, when taken in context, all the prosecutor was doing was ask that the jury return a "just verdict," one supported by the evidence.

After reviewing the record and considering the prosecutor's statements within a broader context, I do not find that the statements were "of sufficient magnitude to undermine confidence in the jury's decision." *Tucker*, 802 F.2d at 1296. The prosecutor went on in his closing argument to say the following:

> We have this wonderful system where judges and juror decide and deliberate. We don't live in a country where somebody comes to your house in the middle of the night and says you're guilty and we're throwing you in prison. But we give you the power to say, wait a minute, there is justice of all kinds. There needs to be justice for the people who commit a crime and when we've heard all the evidence and we've listened to all the agreements, and we believe that the finger of guilt points in only one direction, it is justice for us to return the verdict of guilty. It would be an injustice if we were to forget our obligation and return any other verdict other than the one that we know I supported by the law and the evidence.

13

Trial Tr. 1075:10-1076:2. It is clear from the above, as well as from the trial judge's admonition to the jurors that "this case must not be decided for or against anyone because you feel sorry for anyone or angry at anyone," that the jurors were instructed to consider only the evidence in coming to a verdict. Therefore, Petitioner's Ground Two is unavailing in forming the basis of the habeas corpus relief that he seeks.

### 2.  Ground Four

Petitioner next argues that the prosecutor inappropriately shifted the burden of proof to the defense during closing arguments when he said the following:

> Let's talk about the cross-examination. You know, it was pretty obvious that the defense attorney is smarter than Floyd Ruel. Asked him a lot of questions, he was getting confused and what's the big point that he was trying to make, whether Floyd was telling the truth about the gun was fired by the Miami Herald building or the gun was fired on a highway. Who cares? This defendant had the gun, he fired the gun. Was there a piece of evidence that says that wasn't true, was there a witness who came in here and said that didn't happen? This is the guy with the gun when they ---

Trial Tr. 1061:8-21. Defense counsel objected to the above statement, and the trial court judge overruled his objection.

Normally, "the state cannot comment on a defendant's failure to produce evidence to refute an element of the crime, because doing so could erroneously lead the jury to believe that the defendant carried the burden of introducing evidence." *Jackson v. State*, 575 So. 2d 181, 188 (Fla. 1991). However, a prosecuting attorney may comment on the jury's duty to analyze and evaluate the evidence and state his or her contention relative to what conclusions may be drawn from the evidence. *See Ruiz v. State*, 743 So. 2d 1, 4 (Fla. 1999). Again, when taken in context, the prosecutor's statements during closing arguments do not undermine confidence in the jury's decision. It is clear that his comments fit into his broader argument concerning Petitioner's guilt based on the evidence. Additionally, during the trial judge's instructions to the jury, he mentioned multiple times that the burden of proof lay squarely with the prosecution. *See, e.g.*, Trial Tr. 1086:7-15 ("To overcome the defendants presumption of innocent [sic], the State has the burden of proving the crime … The defendant is not required to present evidence or prove anything.); Trial Tr. 1089:9-15 ("The Constitution requires the State to prove its accusations against the defendant. It is not

necessary for the defendant to disprove anything, nor is the defendant required to prove his innocence."). Therefore, any harm that may have resulted as a consequence of the prosecutor's improper statements was ameliorated many times over by the trial judge's clear instructions to the jury.

### 3. Ground Five

Finally, Petitioner argues that his constitutional right to a fair trial was violated when the prosecutor called him a racist during closing arguments. Petitioner references the following in support of his argument:

> Prosecutor: He's got that story that he made up. That we went to this Amoco station and this black guy came out and he needed a ride and something about 40 dollars and I got dropped off and I had to walk home. First of all, it's an ugly story because it's sort of a racist ---
>
> Defense Attorney: Objection Judge, objection. We have a motion.
>
> Judge: Overruled, continue.
>
> Prosecutor: So it's a racist stereotype, maybe that's why he said, you know, some young black guy, and eventually gets a full description, body height, gold teeth, all sorts of stuff. But he admits that the same story is a complete, complete lie when the cops talk to him.

Trial Tr. 1009:5-21. In response, Respondent argues that the issue of whether an African-American man actually existed was hotly disputed at trial and the prosecutor was within his right to provide an explanation to the jury as to why the Petitioner might have invented an allegation concerning an African-American man. Additionally, defense counsel addressed the issue of racism in his closing argument as follows:

> But one thing we do know, ladies and gentlemen, that Victor was the driver of the vehicle and Victor dropped Floyd home. But once Victor left the gas station, there was nothing racial about the fact that there was a black guy. There was nothing racial. I'm black. I'm his lawyer, so there's no big deal there ladies and gentlemen, but that black guy left after that. So who did it, that guy who left with Victor.

Trial Tr. 1031:17-1032:2. Defense counsel also raised the issue again with the trial court judge, who denied defense counsel's motion for a new trial. *See* Trial Tr. 1102:4-14.

"[T]he purpose and spirit of the fourteenth amendment requires that prosecution in state courts be free of racially prejudicial slurs in argument. The standard for state prosecution in this regard is thus as high as the rigorous standard required of the federal courts by the fifth amendment's due process clause." *U.S. ex rel Haynes v. McKendrick*, 481 F.2d 152, 159 (2d Cir. 1973). After reviewing the record, I do not find that the prosecution's comments during closing arguments were made with the intent of categorizing the Petitioner as a racist. Additionally, any damage that may have resulted from the prosecution's comments was ameliorated soon thereafter by defense counsel's closing statement, wherein he directly addressed the issue. Therefore, I do not find the decision of the trial court judge in refusing Petitioner's motion for a new trial to be contrary to, or involving an unreasonable application of, clearly established federal law, or involving an unreasonable determination of the facts in light of the evidence presented. Thus, Petitioner has failed to make out a claim for habeas relief as to Ground Five of his Petition.

### c. Certificate of Appealability

Finally, I am also declining to issue a certificate of appealability as to any of the claims raised here by Petitioner. In order to obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this standard, a petitioner must demonstrate "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented here are adequate to deserve encouragement to proceed further." *Jones v. Sec'y, Dep't of Corr.*, 607 F.3d 1346, 1349 (11th Cir. 2010) (internal quotation marks omitted). Petitioner has failed to make such a showing on any of the grounds alleged in his Petition.

## IV.   CONCLUSION

After fully reviewing the arguments presented, the record, and relevant legal authorities, I do not find that the trial court's adjudication of Petitioner's claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. Therefore, it is **ORDERED and ADJUDGED** as follows:

1. Petitioner Levi Jessie Medina's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (ECF No. 1) is **DENIED**.

2. A Certificate of Appealability is **DENIED**.

3. All pending motions, if any, are **DENIED** *as moot*.

4. The Clerk shall **CLOSE** this case.

    **DONE and ORDERED** in Chambers at Miami, Florida this 24th day of November 2015.

*[signature]*
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Counsel of Record*